UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ANTHONY J. CIULLO,

              Plaintiff,                         **NOT FOR PUBLICATION**
                                                   **MEMORANDUM & ORDER**
-against-                                    10-CV-4484 (CBA)(VVP)

YELLOW BOOK, USA, INC.,

              Defendant.
------------------------------------------------------------------x
AMON, Chief United States District Judge:

      Plaintiff Anthony Ciullo has brought suit against his former employer, Yellow Book,

Inc., alleging discrimination and retaliation in violation of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 630 et seq., the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12111 et seq., and the New York State Human Rights Law ("NYSHRL"),

N.Y. Exec. L. § 290 et seq.  Ciullo also asserts a breach of contract claim.  Yellow Book has

moved for summary judgment, seeking dismissal of the complaint in full.  For the reasons stated

below, summary judgment is granted.

I.      **Background**

      Yellow Book is a national provider of marketing solutions to small businesses, offering a

product portfolio that includes printed Yellow Book classified advertising directories, online

advertising services, and other print, online, and direct mail products and services.  Ciullo was

hired by Yellow Book as a sales representative ("SR") in October 1999, when he was 56 years

old, and he remained employed there until his resignation on June 30, 2006.

      Yellow Book SRs are typically assigned to work for a specified period of time in a

geographic market called a "canvass," where they are responsible for soliciting orders from

businesses for advertisements in Yellow Book directories or other products. Once the sale team completes the canvass for a particular market, the Yellow Book directory is published and distributed to households and businesses in that territory, and the sales team moves on to another canvass. Ciullo worked on two canvasses per year, one commencing in the spring and the other in the fall. During Ciullo's employment with Yellow Book, he alternated between the Manhattan and Rockland County canvasses from October 1999 to August 2004, and then between the Hudson Valley and Rockland canvasses from September 2004 until his resignation in June 2006.

As an SR, Ciullo's primarily objectives were to maintain and renew existing advertising business, to increase business from returning advertisers, and to bring in new advertisers. Accordingly Ciullo, like other SRs, was compensated through a base salary plus commissions. The highest commission rates were paid for new business, the lowest rates for straight renewals, and a middle rate for increasing revenue from existing advertisers. Prior to each canvass, Yellow Book would distribute to each SR a list of existing accounts to renew or increase, plus a list of designated streets and neighborhoods in which to prospect for new advertisers.

Ciullo testified that after he accepted his job at Yellow Book in 1999, to help start the then-new Manhattan directory, he was verbally told during a training session that if an SR secured a new advertiser or increased revenue from an existing advertiser, the relevant account was guaranteed to be reassigned to that SR the next time he or she returned to the canvass. (Ciullo Dep. at 48-52.)[1] He further stated that he understood the company policy to be that SRs would only lose the accounts they previously serviced if they committed misconduct or if the

---

[1] The Court observes that in opposition to the defendant's motion for summary judgment, Ciullo has submitted a declaration that at times provides a different version of the facts than his deposition testimony. It is of course "axiomatic that a party cannot defeat summary judgment by submitting an affidavit that contradicts prior sworn deposition testimony." United Magazine Co. v. Murdoch Magazines Distribution, Inc., 393 F. Supp. 2d 199, 212 (S.D.N.Y. 2005); see Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."). Thus, where there are clear contradictions between Ciullo's deposition and declaration, the Court has relied upon the facts in his deposition.

revenue on the account decreased.  (Id. at 52.)  Ciullo testified that in light of this policy, he would devote some amount of time to staying in contact with his clients, even after a particular canvass closed, in order to maintain customer satisfaction and ensure a renewal or increase the next time the canvass opened.  (Ciullo Decl. ¶ 3.)  Ciullo admitted that this policy of SRs getting to "keep their accounts" was not in writing, and that he is not aware whether other SRs always received back the accounts they previously serviced.  (Ciullo Dep. at 60-61, 105, 266.)

Ciullo also submitted identically worded affidavits from two former Yellow Book employees, Kevin Murphy and John Chargar, which state that during these individuals' unspecified tenure of employment as SRs at Yellow Book, they were encouraged to stay in contact with their customers after a canvass closed, and were told that it was in everyone's best interests to maintain a continuous relationship between sales agents and clients.  Chagar and Murphy both somewhat vaguely refer to the fact that Yellow Book management told them that they would be reassigned the accounts they previously serviced on each canvass, and that they should treat their accounts like their own "personal business."  Curiously, neither affidavit squarely states whether Chagar, Murphy, or other SRs they knew always got their accounts back on subsequent canvasses.

Yellow Book managers testified that there was no formal company policy regarding SRs' right to "keep" their previous accounts.  These witnesses stated that continuity of the assigned SR was one of several factors that contributed to the allocation of accounts on each canvass, along with such factors as the SR's prior performance, customer needs, regional variances, and the need to ensure that revenue was adequately distributed among all the SRs.  (Voucas Dep. at 20-27; O'Day Dep. at 31, 38; Pl. Ex. X. at D00138; Jack Decl.)

In July 2001, Yellow Book offered its SRs a new pay plan, which involved a

50% lower base salary and higher commission rates.  Ciullo at the time elected to participate in this new payment plan, as he believed that in light of his large portfolio of existing customers and his success at obtaining renewal business, he would receive a higher income that way. (Ciullo Dep. at 314-15; Ciullo Decl. ¶4.)  When Ciullo transferred from the Manhattan to Hudson Valley canvass in 2004, he again elected this lower-base-salary plan.  (Pl. 56.1 Stmt. ¶ 7.)  His commission structure was thus 5% of renewal revenue, 10% of increase revenue, and 15% of new business revenue.  (Schindel Decl., Ex. 2.)

From 1999 through 2002, Ciullo claims that he was consistently reassigned accounts that he had serviced on the prior canvass.  However, in the fall of 2002, following some management changes, Ciullo claims that $150,000 worth of his previous accounts were removed from his Manhattan assignment.  (Ciullo Dep. at 74-75, 87.)  Ciullo spoke with a manager, Bob Fryer, who told him that "he took the accounts away to give it to newer and younger reps coming in because he needed the revenue to attract new people into the business."  (Id. at 89.)  Fryer also informed Ciullo that the accounts belonged to Yellow Book and that management could "do with them what they want."  (Id. at 90.)  Ciullo admitted that for that Manhattan canvass, he missed his goal by around 50%, which was more than the missing revenue from the reassigned accounts. (Id. at 93.)  Ciullo testified, "I admit wholeheartedly that that canvass, failure in that canvass was mine.  I just was not motivated to work for [Bob Fryer]."  (Id. at 95.)  Ciullo's failure to meet his sales goal resulted in him being "overdrawn" on his salary by $10,000, which he would need to pay back to the company.  (Id. at 106; Ciullo Decl. ¶ 7.)

Ciullo testified that around the same time, he heard that Yellow Book management had also taken accounts away from another SR named Ned Carnes who was around 70 years old, and who subsequently quit.  (Ciullo Dep. at 98.)  Ciullo admitted that he did not hear this information

from Carnes directly, and that he had no direct knowledge of how other SRs' lists were affected. (Id. at 98-99.)

In the spring of 2003, Ciullo injured his knee and took eight weeks of paid disability leave following knee surgery. (Id. at 99.) Ciullo was scheduled to return to work in June 2003, two weeks prior to the halfway point of the Rockland canvass. He testified that when he returned to work, 60% of his prior Rockland accounts were missing from his list. (Id. at 101.) He complained to his immediate supervisor, Stacy Spears, and threatened legal action. (Id. at 102.) On June 16, 2003, Ciullo spoke with Fryer, who told him again that management could do what they pleased with the accounts, and that he had already assigned them to newer, more junior SRs because he needed to be able to guarantee them a certain amount of work. (Id. at 103, 113.) Fryer also indicated that he was worried the accounts would not get sold in time if they were not reassigned. (Id. at 112.) Ciullo again conceded that he had no knowledge of whether the account lists of other SRs were dealt with in a similar manner, but stated that he did not hear others complaining. (Id. at 105.) He also stated that Fryer and other managers never made any comments about Ciullo's age or knee injury in their conversations. (Id. at 112.)

Around the same time as his conversation with Fryer, Ciullo called Human Resources to complain about the situation. Within a week, he learned that the $10,000 indebtedness from the prior Manhattan canvass had been removed. His former accounts also began reappearing on his assignment list. (Id. at 105-06, 108.) Ciullo estimated that over the course of the next few canvasses, around 98% of his previous accounts were returned to him. (Id. at 117.) He stated that he "felt vindicated." (Ciullo Decl. ¶ 7.)

During the 2003 Rockland canvass, Ciullo finished at 77% of his sales goal. (Pl. Ex. X at D00130.) He testified that he felt his sales goal was not properly adjusted to reflect the fact that

he had entered the canvass late following his knee surgery, and that when new SRs joined the company mid-canvass, their sales goals were typically reduced based on their late arrival.  (Id. at 125.)  It does not appear that Ciullo asked management for an adjustment in his sales goal when he returned to work after his surgery, and he admitted that when he received a performance review in mid-2004 that documented his sales deficit during the 2003 Rockland canvass, he did not ask his supervisor for an explanation or raise any objections.  (Id. at 119-24.)

It appears that following the 2003 Rockland canvass, Ciullo was largely satisfied with Yellow Book management for a little over two years.  He testified that he had no complaints about the 2003-2004 Manhattan canvass, and that he had a strong performance in the 2004 Rockland canvass.  (Id. at 140.)  In September 2004, Ciullo traded his Manhattan canvass for the new Hudson Valley canvass, under the management of Marnel Ahern and Antonella Toscano O'Day.  (Id. at 146.)  Ciullo noted that he was given a choice of sales zones within Hudson Valley, and that he chose areas close to where he lived without visiting the territories.  (Id. at 146-49.)  Unfortunately, his selected areas proved to be economically depressed and did not generate as much business as he hoped.  As a result, he stated that he "had a poor performance" and did not hit his sales goals, although it does not appear that he faulted anyone in management for this fact.  (Id. at 148-50.)  He also said that he had "no complaints" about the 2005 Rockland canvass that he started in the spring.  (Id. at 150, 162.)

In performance reports dated Spring 2003 through Fall 2005, Ciullo was often far below his objective for new business sales—even in the canvasses that closed in 2004, where he exceeded his total revenue objective.  (Pl. Ex. X, at D00130, D00134.)  Ciullo testified that early in his employment, management only cared about SRs meeting the total revenue goal, but that over time, more emphasis was placed on meeting goals in each index:  renewal, increase, and

new business.  (Ciullo Dep. at 78.)  In his performance reviews dated July 2004 and March 2005, Ciullo's managers noted that he was very strong in the renewal area, but lagged in generating new advertisers.  (Schindel Decl., Ex. 6, 7.)  His overall performance in both reviews was rated at "below expectations."  (Id.)  Again, Ciullo conceded that his managers never made comments about his age when discussing these performance reviews with him.  (Ciullo Dep. at 156.)

In August 2005, Ciullo was at 90% of his sales goal for the Rockland canvass and requested a three-week vacation, which he was granted.  He then saw a doctor and learned that he had Type II diabetes.  (Id. at 156-57.)  The disease was making it tiring for him to work more than 8-hour days, and he began having frequent doctor's appointments.  (Id. at 157-59.)  He discussed his health issue with his managers and attempted to finish up the Rockland canvass, but was only able to make it to 93% of his sales goal.  (Id. at 161.)  Ciullo testified that he had no complaints about the way his managers treated him at the end of 2005 and into the next Hudson Valley canvass.  (Id. at 162-63.)  His requests to attend medical appointments and to work limited hours were always accommodated without protest from his managers.  (Ciullo Decl. ¶ 16; Ciullo Dep. at 279.)

The 2005-2006 Hudson Valley canvass posed new challenges to Ciullo. For the first half of the canvass, Ciullo focused exclusively on obtaining renewals from former customers in order to offer them Yellow Book's early decision incentive program.  (Ciullo Dep. at 248-49.)  His territory for soliciting new business, which he turned to later in the canvass than expected, was comprised mainly of businesses that were advertising in a competitive directory owned by a company called Transwestern.  Before Ciullo began soliciting these businesses, however, he claims that management announced that Yellow Book was going to purchase Transwestern and did not want to create customer confusion in those zones.  (Id. at 163-64.)  Ciullo testified that

management therefore put a "moratorium" on soliciting Transwestern advertisers, and as a result of that policy, as well as the time he was losing on medical appointments, Ciullo did not meet his sales goal.  (Id. at 158-59, 163, 250.)  Ciullo testified that management began criticizing his poor Hudson Valley performance, stating that Ciullo had spent too much time on his existing customers before the Transwestern moratorium was put in place.  (Ciullo Dep. at 249.)  His managers thus threatened to take accounts away from him in the upcoming Rockland canvass if his performance did not improve.  (Id.)  Ciullo claims that he told his supervisor Marnel Ahern that his health was affecting his performance but she ignored him.  (Id. at 170.)  Ciullo stated that he felt Ahern had a "success above all else" attitude that was insensitive to his needs, although he conceded that he did not know how she dealt with other SRs.  (Id. at 173.)

Ciullo acknowledged during his deposition that the Transwestern "moratorium" likely affected everyone in the office.  (Id. at 164.)  He stated that lots of people were "hurting" as a result of the issue, and that management did not offer anyone assistance or amelioration until March 2006, when management allowed all the SRs to begin the next Rockland canvass early in order to generate income.  (Id. at 164-67.)  Ciullo also conceded in his deposition that at no point during the Hudson Valley canvass did he speak with his managers to request that his sales goals be lowered or that he be provided with other assistance.  (Id. at 255-56.)

At some point in late 2005 or early 2006, Ciullo's managers put him on a "performance improvement plan."  (Id. at 216.)  The plan required him to generate five new sales by a certain date, and to meet certain revenue goals in the renewal, increase and new business indices.  (Id.).  Ciullo also had to call into his manager every day to log his sales activity.  (Id. at 218.)  Apparently, another element of such a performance plan was to be placed on the low-base-salary/high-commission payment plan, in order to motivate the SR to seek out more sales and

commissions. (Carson Dep. at 44.) But, as noted previously, Ciullo had already been opting for that plan since 2001. (Ciullo Dep. at 217.) Ciullo finished the Hudson Valley canvass at only 75% of his total sales goal. (Pl. Ex. X at D00130.)

When Ciullo received his Rockland assignment, sometime in late March or early April 2006, he claims that his list of accounts went from around 65 (the number of accounts he had serviced and renewed on the prior canvass) down to 31, and the total revenue was cut from $324,860 to $191,508. (Ciullo Decl. ¶ 19; Ciullo Dep. at 176, 178, 200.) He also claims that he was given an unreasonably high $60,000 new business goal to solicit in a territory called Pearl River. (Ciullo Decl. ¶ 22.) Accordingly to Ciullo, a competitor with lower rates was only selling $24,000 worth of business in that area, so it was impossible for him to meet the goal. (Id.) Ciullo stated that he does not believe other SRs were dissatisfied with their account lists because he did not hear anyone else complain. (Id. at 174.) Ciullo conceded, however, that Pearl River had been on the list of territory preferences that he had submitted prior to the start of the Rockland canvass. (Id. at 209, 260, 295.) He also conceded that SRs frequently encountered difficulties in their territory assignments, and it was part of their job to "work it out." (Id. at 294-95.)

Both parties have submitted as an exhibit an SR ranking report for the 2006 Rockland canvass, dated June 8, 2006. (Pl. Ex. J; Def. Ex. 11, at D0249; docket entry #36.) This document reflects that notwithstanding Ciullo only receiving 31 accounts in number on that canvass, he in fact was assigned the second highest total revenue in dollars. Indeed, Ciullo admitted in his deposition that the 31 accounts he did receive back for that canvass were mostly the higher revenue accounts. (Ciullo Dep. at 326.; see also Pl. Ex. X, at D00126.) The ranking chart also indicates that all the SRs were given a $60,000 new business goal.

At some point later in April 2006, Ciullo complained about his Rockland assignment to O'Day, who told him that his accounts were reassigned for two reasons: to provide revenue to new SRs and to penalize him for failing to meet his sales goals on the previous three canvasses. (Id. at 178-79, 264-65.) O'Day did not at this time say anything about Ciullo's age or medical condition (id. at 179-80), although Ciullo stated that at a previous meeting, Ahern told him that her mother was diabetic, that it was not as serious as Ciullo was making it out to be, and that he should put it behind him. (Id. at 180.) Ciullo also learned later, during the EEOC proceedings, that Mike Voucas had authorized a reduction in his account list because management was not sure he could "handle" all the accounts. (Id. at 213, 215, 333.) In a letter to managers sent sometime after April 6, 2006, Ciullo threatened legal action and stated that he felt that his Rockland accounts were reassigned for discriminatory reasons. (Id. at 175; Pl. Ex. U.) He also stated that he believed management was trying to force him to resign, but he did not intend to do so. (Pl. Ex. U.) Management told Ciullo that if he made five new sales, they would assign him more accounts and revenue. (Id. at 296, 302-04.)

Ciullo stated that by around this time, his medical condition was stabilizing, but he still had difficulty working more than an 8 hour day. (Ciullo Dep. at 180-81.) He also stated that he did not believe that being limited to an 8-hour workday significantly affected his ability to do his job. (Id. at 185, 280.) During the Rockland canvass, he did not request any medical accommodations other than not having to work extended hours. (Id. at 291.)

Notwithstanding his disputes with his managers, Ciullo started on his Rockland account list and, according to Ciullo, he was selling well. (Id. at 200.) Sometime in late May 2006, Ciullo spoke to Tamara Carson in Human Resources and requested either that the missing accounts be returned to him, or that he receive the equivalent of the commission he would have

made on them.  (Id. at 194.)  Carson told him those options were not possible, so Ciullo then requested to be put on the payment plan with a higher base salary.  Carson replied that he had to remain on the lower-base-salary arrangement as part of his performance plan.  (Id. at 197, 216.) It appears that at some point, as Ciullo's performance was improving, he also asked O'Day if he could change payment plans, but she said no.  (Id. at 217-18.)

Ciullo claims that by the end of June he had moved up on the SR ranking report from the bottom to fifth place, and he had made 8 new sales.  (Id. at 200, 302.)  No one in management criticized his sales performance in Rockland, or suggested that he was not meeting expectations for that canvass.  (Id. at 212, 261, 267, 350.)  Moreover, no one at that time gave him any indication that there was a problem with his age or health condition.  (Id. at 292.)  Ciullo conceded that based on management's prior representations and his meeting of his sales goals, he was expecting to receive more accounts later in the summer.  He admitted that no one suggested that he would not be given the opportunity to receive more work, and that prior to his resignation he never inquired about when he could receive additional accounts.  (Id. at 297, 303-05, 341.)

In early June 2006, Ciullo was also offered the opportunity to move to a new Westchester office and work on the former Transwestern sales territory.  (Id. at 203, 272.)  He told a supervisor that he would only move if he could change payment plans.  (Id.)  The supervisor told him that he would look into the possibility, but Ciullo never heard back prior to his resignation. (Id. at 272, 274, 336-37.)  Ciullo also noted that around this time he had been talking about possibly retiring after the 2006 Rockland canvass.  (Id. at 206.)

According to Ciullo, on June 30, 2006, O'Day suggested that he resign.  Ciullo testified: "She came over to my desk and said to me, Tony, why don't you resign.  It was a very low key, not aggressive, not mean-spirited.  It was almost just conversational."  (Id. at 203.)  Ciullo

indicated that he was "surprised" by the suggestion given his improvement, but he did not ask for any explanation of why she felt he should resign, and he did not tell her that he wanted to stay; he "just agreed and started to write the resignation letter." (Id. at 277, 289, 292-93, 297.) Ciullo testified that he felt management was trying to force him out, and by that point he "had no fight left." (Id. at 201-02.)

Ciullo then began writing a letter, which stated: "I have been asked to submit a letter of resignation by Antonella O'Day . . . because I cannot perform my duties as an account executive, up to the company's expectations and my lack of willingness to transfer to the new Westchester county office." (Pl. Ex. P.) Ciullo testified that this reference to his inability to perform his duties was referring back to a prior conversation he had with O'Day at the end of the Hudson Valley canvass. (Id. at 275.) Ciullo claims that as he was writing this letter, O'Day "stopped [him] midstream" and said, "I'm not asking you to resign . . . Don't phrase it that way." (Ciullo Dep. at 201, 246.) Thus, Ciullo wrote and submitted a second letter stating that he was resigning without explanation. (Pl. Ex. P.) Ciullo dated the letter as effective July 21, 2006, because he had accrued paid leave time that would last until then, but his last day at the office was June 30. (Id. at 202.)

Ciullo filed an administrative charge with the EEOC on April 9, 2007, and commenced the present action on October 1, 2010. At oral argument, Ciullo's counsel clarified that the only adverse action he is pursuing in his age and disability discrimination claims is his allegation of constructive discharge, but that the narrative leading up to Ciullo's resignation is relevant as context and background for that claim. (Transcript of Oral Argument, April 19, 2012, at 4-6.) He also indicated that he is maintaining claims of retaliation and failure to accommodate. (Id. at

20-21, 28.)  Finally, the complaint asserts that by reassigning Ciullo's previously serviced accounts, Yellow Book is liable for breach of contract.

## II.    **Standard of Review**

Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 23 (1986); Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999).  The Court's function on summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of fact to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not that of a judge."  Id. at 255; see also Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

The court is required to view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Delaware & Hudson Railway Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir.1990).  Nevertheless, the non-moving party cannot rest on mere allegations or denials but must instead set forth specific facts showing there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact.").  No genuine issue exists unless there is sufficient evidence favoring the nonmoving party for a rational trier of fact to find for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50 (citations omitted).  The Second Circuit has made clear that "the salutary purposes of summary judgment—avoiding

protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." Weinstock, 224 F.3d at 41 (internal quotation marks omitted).

## III.    Age & Disability Discrimination

Claims of discrimination under both the ADEA and the ADA are analyzed according to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Additionally, courts in this circuit analyze state law discrimination claims brought under the NYSHRL in the same manner as their federal counterparts. See Spiegel v. Schulman, 604 F.3d 72, 80 (2d Cir. 2010); Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009); Graves, 457 F.3d at 184 n.3. Thus, given that Ciullo has stated that the adverse action at the basis of all his claims is his alleged constructive discharge in June 2006, his state and federal discrimination claims will "survive[] or fail[] on the same basis." Id.

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must demonstrate:  (1) that at the relevant time he was 40 years of age or older; (2) that he was qualified for his position; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred in circumstances giving rise to an inference of discrimination. Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir.2001).

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate:  (1) that his employer is subject to the ADA; (2) that he suffers from a disability within the meaning of the ADA; (3) that he was qualified to perform his job with or without reasonable accommodation; and (4) that he suffered an adverse employment action because of his disability. Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008);

Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004); Pabon v. N.Y.C. Transit Auth., 703 F. Supp. 2d 188, 194 (E.D.N.Y. 2010).

## 1.      Adverse Action – Constructive Discharge

Even where an employee is not actually terminated by his employer, a "constructive discharge" will qualify as an adverse action in an employment discrimination claim.  Stetson v. NYNEX Service Co., 995 F.2d 355, 360 (2d Cir. 1993).  A constructive discharge occurs when an employer, "rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."  Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir.1983); see Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004).  A constructive discharge requires working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  Id.  This is a high threshold to meet, and generally, a constructive discharge cannot be established

> simply through evidence that an employee was dissatisfied with the nature of his assignments . . . . Nor is it sufficient that the employee feels that the quality of his work has been unfairly criticized . . . . Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant.

Stetson v. NYNEX Service Co., 995 F.2d 355, 360-361 (2d Cir.1993) (citations and internal quotation marks omitted); see also Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993) ("[C]onstructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer.").

"Case law [regarding constructive discharge] generally focuses on two parts of this standard:  the employer's intentional conduct and the intolerable level of the work conditions."  Petrosino, 385 F.3d at 229.  Regarding the first prong, the employee must demonstrate that the

employer's actions were "deliberate and not merely negligent or ineffective." Id. at 230 (internal quotation marks omitted). On the second prong, the intolerability of the employee's work conditions "is assessed objectively by reference to a reasonable person in the employee's position." Id.; Terry, 336 F.3d at 152.

Here, viewing the evidence in the light most favorable to him, Ciullo fails to show that his working conditions in June 2006 were objectively intolerable. As an initial matter, Ciullo does not appear to argue, and the facts do not demonstrate, that he was constructively discharged simply because Antonella Toscano O'Day allegedly suggested that he resign. It is true that in some cases, "a triable issue of fact as to constructive discharge may be demonstrated by proof that an employee was presented with the decision to resign or be fired." Murray v. Town of North Hempstead, 2012 WL 43645, at *19 (E.D.N.Y. 2012) (collecting cases); see Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987) (finding triable issue of fact in constructive discharge claim where plaintiff was told "he would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient performance"). However, "[a]lthough threats of termination alone have occasionally been held to be sufficient to permit a rational trier of fact to find that a reasonable person in the employee's shoes would have felt compelled to resign, those cases involved a direct and/or repeated threats from the employer, along with some other adverse conduct." Id. at *20. In this case, Ciullo has not even alleged that a supervisor threatened him with termination, but makes only the vague speculation that if he did not meet his Rockland sales goals, he could have been terminated at some point in the future. (Ciullo Decl. ¶ 18). Indeed, Ciullo stated in his deposition that when he referred in his first resignation letter to his inability to meet company expectations, that assertion was based on something O'Day had said to him back during the Hudson Valley canvass, not during the

conversation where she allegedly suggested that he resign.  (Ciullo Dep. at 275.)  This is not a

case where, for example, an employee was told "that 'it was best if he resigned' because he 'was

going to be terminated.'"  <u>Valdes v. N.Y.C. Dep't of Environmental Protection</u>, 1997 WL

666279, at *3 (S.D.N.Y. 1997).  Ciullo went to some effort in his deposition to describe the non-

confrontational nature of his conversation with O'Day, and admitted that he did not ask for any

explanation or offer the slightest bit of protestation.  In fact, he testified that he hugged her

before he left.  (Ciullo Dep. at 291.)  A factfinder simply could not infer from Ciullo's testimony

that a reasonable employee would have felt "compelled to resign" during that exchange.

The question, then, is whether the events leading up to that conversation somehow

accumulated to make Ciullo's work environment unbearable.  As explained below, the Court

cannot conclude, even considering the preceding months and years, that the situation as it existed

in June 2006 could support a constructive discharge claim.

As an initial matter, to the extent that Ciullo's opposition papers place a great deal of

emphasis on the events of 2002-2003, those incidents plainly are not relevant to his resignation

in 2006.  Indeed, Ciullo testified that, as a result of his complaints in 2003, he received 98% of

his accounts back and was satisfied with the problem's resolution.

Turning to more recent events, although Ciullo was markedly frustrated by the

"Transwestern moratorium" during the 2005-2006 Hudson Valley canvass, and the "stripping" of

his accounts at the start of the 2006 Rockland canvass, his own testimony demonstrates that as

the Rockland canvass progressed, his problems were on the mend.  Ciullo testified that after the

canvass got underway, he did not hear any complaints from management regarding his

performance, and that by June he was exceeding the expectations of his performance plan.  There

is therefore no basis for inferring that a termination was looming.  <u>See</u> <u>Miller v. Batesville</u>

Casket Co., Inc., 312 Fed. App'x 404, 406-07 (2d Cir. 2009) (placement on "performance improvement plan" was not tantamount to a constructive discharge where there was no evidence that it was "impossible to meet").  Notwithstanding the presence of some negative feedback in Ciullo's 2004 and 2005 performance reviews, there is also no hint in those documents that management was contemplating firing him.

Moreover, setting aside Ciullo's feelings that he was entitled to keep all his past accounts, he has not controverted the evidence that he had one of the highest total revenue assignments for the Rockland canvass, and the same new business goal as the other SRs—thus highlighting his inability to demonstrate that he was being "starved" into resigning.  He also testified that he expected management eventually to assign him more accounts based on his improved performance, and that he had not yet asked about that possibility in June.  And although Ciullo believed he should have been allowed to change to a higher compensation plan as soon as his performance began improving, the failure of management to award him this benefit within a few months is not an intolerable condition.  See Petrosino, 385 F.3d at 231 (failure "to receive an anticipated raise" does not establish constructive discharge).

Although Ciullo clearly believes that his managers did not properly appreciate his work efforts and limitations, "a disagreement with management over the quality of an employee's performance will not suffice to establish a constructive discharge" where the employer has not set unattainable objectives or implied that termination is imminent.  Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996); see also Spence, 995 F.2d at 1156 (noting that "an employer is entitled to insist on as high a standard of work performance as it deems appropriate").  Although O'Day's alleged suggestion that he resign appears somewhat curious when considered alongside Ciullo's claim that his performance was notably improving, Ciullo

simply has not presented evidence from which a factfinder could infer that Yellow Book management deliberately created an environment so unbearable that an reasonable employee would have felt compelled to resign.

Accordingly, as Ciullo has failed to establish a constructive discharge, his prima facie case of discrimination must fail.  Summary judgment is granted to the defendant on this claim..

**IV.     Failure to Accommodate**

In disability discrimination claims premised on failure to accommodate, the plaintiff must establish his prima facie case by demonstrating:  "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 183-84 (2d Cir. 2006) (quoting Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004)).  For the reasons stated below, the Court concludes that Ciullo has failed to meet his prima facie burden.

As an initial matter, it is undisputed that all of Ciullo's requests to attend medical appointments and to not work in excess of an 8-hour day were granted without protestation from Yellow Book management.  Ciullo also testified that by the time the 2006 Rockland canvass began, his health condition "was pretty well stabilized," and it was no longer having a notable impact on his ability to do his job.  (Ciullo Dep. at 279-80.)  The one medical request he made during his final canvass was submitting a note to Human Resources from his doctor stating that he was not to work "extended hours" for three months.  (Id. at 280.)  Ciullo testified that after submitting the request, no one told him there was any problem with his hours, and he was successfully meeting his performance goals.  (Id. at 279-80)

Despite conceding that all his medical requests were granted, Ciullo nonetheless maintains that Yellow Book "should have" granted additional accommodations following his diabetes diagnosis that he appears to have never expressly requested, such as referring him additional accounts during the Hudson Valley canvass, or lowering his sales goals to account for his health issues.  Ciullo never acknowledges any apparent tension in these two proposed accommodations, one of which implies that Ciullo was eager for more work, the other of which suggests he required less work.   At his deposition, when Ciullo was asked whether he ever approached his managers during the Hudson Valley canvass to request assistance in meeting sales expectations, Ciullo responded:  "I would say the answer to that question has to be no because there was no way to get additional work. . . .  I pretty much accepted the fact that . . . I wasn't going to be able to do anything further."  (Ciullo Dep. at 254-56.)

 "[G]enerally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."  Graves, 457 F.3d at 184; see also Batlidze v. Harris Beach, LLP, 361 Fed. App'x 216 (2d Cir. 2010) (same).   Although the Second Circuit has stated that a request for accommodation may not be required "where the disability is obvious," Brady, 531 F.3d at 135, the Court does not believe that this exception applies to Ciullo.  In a competitive sales environment—where employees are primarily compensated through commissions, are frequently out of the office on sales calls, and where the limiting effects of a diabetic condition might not be routinely apparent—the Court does not believe that an employer has a sua sponte duty to lower an employee's sales goal or to provide the employee with a larger assignment.  Indeed, Ciullo himself testified that his managers did not take his condition seriously enough, so it is unclear how those managers also should have known to grant him additional, unrequested accommodations. (Ciullo Dep. at 170, 180.)

In any event, even if Ciullo had requested these measures, they would not qualify as "reasonable accommodations." The Second Circuit has held that reasonable accommodation "does not require the perfect elimination of all disadvantage that may flow from the disability; it does not require a lowering of standards, nor that the employer make 'fundamental' or 'substantial' modifications in order to eliminate the disadvantages flowing from the disability." Find v. N.Y.C. Dep't of Personnel, 53 F.3d 565, 567 (2d Cir. 1995) (citing Southeastern Comm. College v. Davis, 442 U.S. 397, 413 (1979)); see also Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991) ("'[R]easonable accommodation' does not mean elimination of any of the job's essential functions."); Giallanza v. Time Warner Cable, 2009 WL 857502, at *8-9 (W.D.N.Y. 2009) (plaintiff who was not meeting sales goals could not establish reasonable accommodation claim because he was unable to perform essential aspects of his position); 29 C.F.R. Pt. 1630, App. § 1630.2(n) ("It is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards."). As the record in this case makes clear, the core functions of the SR position included securing new business and meeting certain revenue goals. Yellow Book, therefore, was not required to provide more accounts and lower sales quotas to an SR employee who was not able to meet those standards.

Finally, although it appears that Ciullo did request to be placed on the higher base compensation plan, requests for higher compensation do not qualify as reasonable accommodations. Cf. McBride v. BIC Consumer Products Mfg. Co., Inc., 583 F.3d 92, 98 n.4 (2d Cir. 2009) ("[A]n employer does not have an obligation to promote an employee in order to accommodate a disability that renders her unable to perform the essential functions of her current job."); Pender v. State of N.Y. Office of Mental Retardation and Developmental Disabilities,

2006 WL 2013863, at *8 (E.D.N.Y. 2006) ("[A]n employer has no generalized duty under the ADA to promote a disabled employee as an accommodation itself." (collecting cases)). Ciullo's own testimony indicates that his request to change payment plans was, in effect, simply a request for an impromptu raise, because he did not feel that he was making sufficient commissions under his existing plan. Additionally, Ciullo has made no showing that a higher base salary would have enabled him to perform the essential functions of his position; clearly, such an alteration would not have affected Ciullo's sales goals or his ability to meet them. See McBride, 583 F.3d at 97 ("The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment."). Therefore, a claim for reasonable accommodation on that basis cannot lie.

Accordingly, summary judgment is granted to the defendant on the failure to accommodate claim.

## V.     Retaliation

A claim for retaliation requires the plaintiff to establish a prima facie case that "(1) the employee was engaged in an activity protected by the ADA [or ADEA], (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000); see Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990). Protected activity "includes opposing or charging unlawful practices, or participating in any manner in the investigation, proceedings or litigation of a [discrimination] claim." Pocino v. Culkin, 2010 WL 3516219, at *3 (E.D.N.Y. 2010). However, the plaintiff "need not establish that the conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable

belief that the underlying challenged actions of the employer violated th[at] law." Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.1999). The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions, and then back to the plaintiff to show pretext. Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002).

Ciullo's opposition papers do not even address his retaliation claim. The Court will in any event address whether he can prevail on such a claim. The only relevant protected activity that the Court can locate in the record is the April 2006 letter from Ciullo to Carson, Voucas, and O'Day, following the alleged "stripping" of his Rockland accounts, in which Ciullo complained about his accounts being "taken away" and stated that he felt "pressed to seek legal counsel on what appears to be obvious discrimination." (Pl. Ex. U.)[2] Any general complaints that Ciullo made to management that did not relate to allegations of discrimination do not trigger retaliation protections. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."); Sharpe v. MCI Communications Services, Inc., 684 F. Supp. 2d 394, 406 (S.D.N.Y. 2010) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.").

If the later events of May and June 2006 contained an adverse action, Ciullo likely would have succeeded in meeting his prima facie burden. See Treglia, 313 F.3d at 720 ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."). In the retaliation context,

---

[2] To the extent Ciullo threatened legal action during the events of 2002-2003, the Court concludes that those complaints are far too removed in time to be relevant or have any causal relationship to the events of 2006. Indeed, as noted previously, Ciullo testified that management resolved his complaints satisfactorily at that time. Ciullo also conceded at oral argument that any retaliation claim based on events in 2003 was time-barred. (Tr. at 21.)

an adverse action is defined as one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Mabry v. Neighborhood Defender Service, 769 F. Supp. 2d 381, 398 (S.D.N.Y. 2011) (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). Although this standard is lower than the standard for adverse actions in the discrimination context, see White, 548 U.S. at 62, the Court nonetheless concludes that for the reasons stated above, the events at the end of Ciullo's employment did not contain an adverse action for purpose of a retaliation claim. Ciullo repeatedly testified that, as the Rockland canvass got underway, his performance was improving, he was meeting his goals, and no one in Yellow Book management suggested that his work was unsatisfactory. Moreover, based on Ciullo's own description, it simply cannot be true that his June 30, 2006 conversation with O'Day could have dissuaded a reasonable employee from pursuing a discrimination charge.

Accordingly, summary judgment is granted to the defendant on Ciullo's retaliation claim.

## VI. <u>Breach of Contract</u>

Ciullo claims that Yellow Book's action in reassigning accounts that he previously serviced constituted a breach of contract. This claim is rejected as a matter of law.

As an initial matter, this claim is only timely as applied to the Rockland 2006 reassignments. The statute of limitations in New York for breach of contract claims is 6 years. T&N PLC v. Fred S. James & Co., 29 F.3d 57, 59 (2d Cir. 1994). Ciullo commenced this action on October 1, 2010. As such, any claims arising prior to October 1, 2004 (such as the claims that his accounts were reassigned in 2002 and 2003) are time-barred.

There is no dispute that Ciullo was an at-will employee at Yellow Book. Under New York law, "when parties have an employment contract terminable at will, the contract can be modified and different compensation rates fixed without approval of the other party since the

dissatisfied party has a right to leave his employment."  General Elec. Technical Servs. Co. Inc. v. Clinton, 577 N.Y.S.2d 719, 720-21 (3d Dep't 1991); see Bottini v. Lewis & Judge Co., 621 N.Y.S.2d 753, 754 (3d Dep't 1995) (in at-will employment  "defendant was free to modify the terms of plaintiff's employment, subject only to plaintiff's right to leave his employment if he found the new terms unacceptable").  Thus, even if Ciullo could establish the existence of some sort of oral Yellow Book policy to allow SRs to keep their accounts on future canvasses, Yellow Book was free to alter this policy unilaterally, leaving Ciullo with the right to leave his employment if he wished.  See Waldman v. Englishtown Sportswear, Ltd., 460 N.Y.S.2d 552, 555 (1st Dep't 1983) ("The record demonstrates that defendant Englishtown determined in June 1980 to reduce the commission rate from 6% to 4% prospectively and offered to, in effect, rehire plaintiff Waldman at such new rate. Plaintiff did not have to accept this new hiring, but was free to refuse such employment.").

Ciullo appears to argue that he relied to his detriment on Yellow Book's representations that his accounts would be returned to him the future, by selecting the lower-base-salary compensation plan and by spending time and effort maintaining contact with his customers even after the canvass had ended.  He cites to Bisbing v. Sterling Precision Corp., 312 N.Y.S.2d 305 (3d Dep't 1970), where the court held that a "unilateral contract . . . supplementary to the contract of employment" had been created where, in order to induce employees to remain at the company, the employer offered to continue paying their life insurance premiums when they retired in the future.  Id. at 307-08.  Thus, "[b]y that avowed intention plaintiffs were induced to act. Their conduct was a sufficient acceptance of the proposition and furnished the consideration for [the employer's] undertaking."  Id. at 308.

Ciullo's argument fails for multiple reasons.  According to Ciullo's own narrative, he was on express notice as early as 2002 that Yellow Book management believed it retained the prerogative to reassign SRs' accounts as it pleased.  Even as Ciullo's accounts began to reappear in 2003, management never gave him any statement or indication that it was not reserving the right to move accounts around as it saw fit—indeed, Ciullo was likely receiving those accounts "back" from employees who had expended effort on them in the meantime.  Ciullo never claims that following 2003, any manager ever talked to him about the alleged policy or assured him of its existence as an inducement.  Moreover, there is no evidence in the record that anyone at Yellow Book specifically told Ciullo that if he selected a particular compensation plan, he would always retain his accounts in the future.  Rather, Ciullo testified only that he voluntarily selected his payment plan based on what he perceived to be his own self-interest.  (Ciullo Dep. at 314.)

There is simply no evidence in the record to support the contention that following the events of 2002-2003, Ciullo was somehow induced to remain in Yellow Book's employ, to perform gratuitous additional duties, and/or to remain at a voluntarily selected compensation plan by any outstanding promise or offer by Yellow Book regarding account assignments.  Cf. Waldman, 460 N.Y.S.2d at 555 ("Plaintiffs do not allege and do not demonstrate any representation made by defendants for the purpose of inducing plaintiff Waldman to accept the reduced commission rate and to remain in the employ of Englishtown.").  Indeed, Ciullo's opposition concedes that Yellow Book was "free to change [its assignment policies] prospectively."  (Ciullo Opp. at 25.)  Even on Ciullo's version of the events, any policy announced in 1999 was abrogated by management as early as 2002, and Ciullo voluntarily remained an at-will employee at Yellow Book.  An at-will employee's unilateral hope that certain management trends will continue into the future does not create an enforceable contract.

Accordingly, summary judgment is granted to the defendant on Ciullo's breach of contract claim.

**VII.** **Conclusion**

For the stated reasons, summary judgment is granted to the defendant in full. The Clerk of Court is directed to enter judgment and close the case.


SO ORDERED.

Dated: Brooklyn, New York
      July 6, 2012

_____/s/_____
Carol Bagley Amon
Chief United States District Judge
